UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RAYMOND MURRAY,                  )
                                 )
        Plaintiff,               )    CIVIL ACTION NO.
                                 )    11-40176-DPW
v.                               )
                                 )
WARREN PUMPS, LLC and COLFAX     )
AMERICAS,                        )
                                 )
        Defendants.              )
                                 )

MEMORANDUM AND ORDER
September 11, 2013

        After Plaintiff Raymond Murray's employment with Defendant

Warren Pumps ended in 2011, he brought this action alleging

disability discrimination, retaliation, and harassment under both

federal and Massachusetts law.  Warren Pumps had rehired Murray

in early 2008 knowing of his history of back problems due to a

failed surgery on herniated discs in his spine in 1997.  Murray

argues that Warren Pumps discriminated against him as a disabled

person by failing to accommodate his disability and by firing him

for being disabled.  He also argues that Warren pumps retaliated

against him by firing him for raising safety complaints.

Finally, Murray argues that his superiors created an unlawfully

hostile work environment.

        The parties dispute nearly every aspect of this case, from

the most fundamental - such as whether Murray qualifies as

disabled and whether Warren Pumps fired Murray at all - to

subordinate details - such as the accuracy of citations to

evidence in support of various arguments.  Defendants move for
summary judgment on all counts of the Complaint.  I will grant
Defendants' motion.

### I.  BACKGROUND

Warren Pumps hired Murray in April 2008 as Safety and
Compliance Manager.  Murray had previously worked for Warren
Pumps from 2003 until 2005, when he left voluntarily to pursue
another opportunity.  At the time Warren Pumps rehired Murray, it
understood that Murray could not lift more than 10 pounds and
could not stand, sit, or walk for an extended period of time due
to a prior back injury and failed surgery.

In 1985, Murray had suffered a disc herniation in his spine.
In 1997, after the herniated disc calcified and broke apart,
Murray underwent spinal surgery.  However, this surgery failed,
and one year later, he had a second surgery to fuse his L4-L5
vertebrae together.  He continues to experience chronic sciatic
pain, cannot do any heavy lifting, and cannot sit, stand, or walk
for long periods of time.  Murray also contends that his back
impairment affects his ability to climb ladders and stairs,
interferes with his sleep, and prevents him from kneeling or
bending over.  However, Defendants dispute these further
restrictions and dispute that Murray ever informed them of any
restrictions other than the lifting and extended walking,
sitting, or standing restrictions.

Murray was involved in a car accident on December 28, 2010. He suffered whiplash, lower back pain, and sciatic pain in his left leg.

Over the course of his employment with Warren Pumps, Murray requested various accommodations for his back injury, including time off for medical treatment, light duty, lifting restrictions, and standing/sitting restrictions as well as an adjusted start time from 6:00 a.m. to 7:00 a.m.  Murray also contends that he requested breaks to raise his legs/feet and an ergonomic workstation to avoid headaches and pain, but Defendants dispute that these requests relate to Murray's alleged disability from his back injury and failed surgery, claiming that they relate instead to his car accident or other issues.

Murray contends that over the course of his employment, his Warren Pumps supervisors discriminated against him on the basis of his disability and because he was raising concerns over safety issues.  He alleges that on May 27, 2011, his supervisor, Matthew Korzec, required him to manage a project for which he had to be at both ends of the Warren Pumps facility and walk more than his restrictions allowed.  He alleges that Korzec gave him unnecessary paperwork which caused him to violate his sitting restrictions.  He also alleges that on three occasions, Korzec required him to violate his lifting restriction, once by asking him to paint, once by asking him to do electrical work involving

3

carrying a 20-pound toolbox, and once by asking him to accept a shipment over 10 pounds because the shipping department employees had already gone home for a holiday.

In addition, Murray alleges that Korzec and Nicole Belechto, a corporate recruiter for Defendant Colfax Americas made discriminatory comments.  He alleges that Korzec stated that "a younger person would be able to accomplish [Plaintiff's] tasks," that Plaintiff "needed to work faster," and that Plaintiff would have been more successful if he "had been at work more often," which Murray contends refers to his leave from work for medical issues.  He also alleges that Belechto and Korzec would question him "on why he needed to take time off" when he requested leave. In an affidavit, he claims that Peter Elleman, Corporate Health Safety and Environmental Manager, told him that Belechto wanted to get rid of disabled employees and that Murray was considered disabled.

Over the course of his employment, Murray raised a number of safety concerns to his supervisor, Korzec, and management.  In particular, in April and May 2011, Murray raised certain health and safety complaints.

Murray alleges that Warren Pumps employees were welding without the proper monitoring devices surrounding the welding area, without the proper protective equipment, and that at least one employee was welding upside down or vertically when he was

4

only certified to weld flat.  He argues that these practices violate a number of industry standards, such as AWS-d18.1 and ASTM 312, as well as federal regulations such as 29 C.F.R. 1910.253(a)(4).

Murray also alleges that Warren Pumps impermissibly allowed other employees to do electrical work under Murray's license outside his presence, and without the proper protective equipment.  He argues that these practices violate a number of industry standards, such as 527 C.M.R. 12, as well as state statutes, such as M.G.L. 14 § 5, 8.

Murray next alleges that his supervisors denied his requests to purchase required personal protective equipment, refused to allow him to attend OSHA training, failed to implement a training and noise level program when the shop floor exceeded 85 decibels, and failed to institute Hazard Communication Standard (HAZCOM) training.  He argues that these practices violate a number of federal regulations such as 29 C.F.R. 1910.95, 1910.133, 1910.134, 1900.1200.

Finally, Murray alleges that Warren Pumps failed to certify employees properly to operate forklifts, trucks, and cranes, but he cites no statutes or other law in this regard.

Defendants contend - and Murray disputes - that Defendants investigated each and every complaint and found no merit to

Murray's allegations, although they did not always keep Murray informed of the progress of the inquiries.

On June 1, 2011, Brian Mills and Crystal Baker called Murray into a meeting during which they asked him whether he was unhappy working at Warren Pumps.  The parties dispute the discussions during the meeting.  Murray alleges that he was fired.  Defendants allege that Murray quit and that one of the participants in the meeting later told Korzec that Murray had quit.  The parties agree that Defendants offered Murray a choice between two severance packages and that Murray did not accept either.

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).

I view the facts in the light most favorable to the party opposing summary judgment. *Rivera-Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011).  However, "conclusory allegations, improbable

inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

## III. DISCUSSION

The Complaint is in five counts.  Count I alleges wrongful termination of an at-will employee in violation of public policy. Counts II and III allege disability discrimination under Massachusetts law.  Finally, Counts IV and V allege disability discrimination and harassment under federal law.

### A.    *Disability Discrimination*

Both federal law and Massachusetts law prohibit employers from discriminating against employees based on any real or perceived disability.  *See* 42 U.S.C. §§ 12112(a), 12112(b)(5)(A)(2011); M.G.L. 151B § 4(16).  As with other claims for discrimination, courts apply the *McDonnell Douglas* burden-shifting analysis in the disability discrimination context: Plaintiff bears the initial burden to establish a prima facie case of discrimination; the burden then shifts to Defendants to articulate non-discriminatory reasons for their actions; and finally the burden shifts back to Plaintiff to show that the non-discriminatory reasons are pretextual.  *See McDonnell Douglas Corp.* v. *Green* 411 U.S. 792, 802-805 (1973).  Because Defendants maintain that they did not fire Murray at all, but that he quit,

the parties focus their arguments on the first stage of the
analysis: the prima facie case.  Murray alleges both disability
discrimination and failure to accommodate his disability.

Although federal courts and state courts articulate the
requirements for a discrimination claim somewhat differently, the
basic elements are the same.  In order to establish a prima facie
case of disability discrimination, a plaintiff must show (1) that
he is disabled, (2) that he is capable of performing his job with
or without reasonable accommodation, (3) that an adverse
employment action was taken regarding him and (4) that the
employer sought to fill the same position the plaintiff held.
*See Dartt* v. *Browning-Ferris Indus., Inc.*, 691 N.E.2d 526, 528
(Mass. 1998); *see also Jones* v. *Walgreen Co.*, 679 F.3d 9, 14 (1st
Cir. 2012) (not requiring that the employer sought to fill the
same position the plaintiff held).

The first two elements of the prima facie case for failure
to accommodate are the same as those for disability
discrimination generally: (1) disability, and (2) that the
plaintiff is capable of performing the job with reasonable
accommodation.  *See Alba* v. *Raytheon Co.*, 809 N.E.2d 516, 522 n.9
(Mass. 2004); *see also Orta-Castro* v. *Merk, Sharp & Dohme Quimica
P.R., Inc.*, 447 F.3d 105, 112 (1st Cir. 2006).  Failure to
accommodate also requires a Plaintiff to show: (3) that he
requested a reasonable accommodation, (4) that his employer

8

refused the accommodation, and (5) that he suffered harm from the employer's refusal.  *See Alba,* 809 N.E.2d at 522 n.9; *see also Orta-Castro*, 447 F.3d at 112.

The meaning of "disability" under federal law and the state definition of "handicap" may differ to some degree.  Until 2008, courts considered M.G.L. 151B the "'Massachusetts analogue' to the Federal Americans with Disabilities Act ("ADA").  *See Whitney* v. *Greenberg, Rosenblatt Kill & Botsoli, P.C.*, 258 F.3d 30, 32 & n.1 (1st Cir. 2001) ("The definitions of 'disability' and 'handicap' are virtually identical in the statutes.  *Compare* 42 U.S.C. § 12102(2) *with* [M.G.L.] ch. 151B, § 1(17).").  In 2008, Congress passed the ADA Amendments Act ("ADAAA") mandating a broader reading of the term "disability."  *See* 29 C.F.R. 1630.1(b)(4) ("The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA"); *Jones* v. *Nationwide Life Ins. Co.*, 696 F.3d 78, 87 n.6 (describing the amended definition of "disability" as "more generous").  Murray's citation to a 2010 First Circuit case, *Faiola* v. *APCO Graphics, Inc.*, for the proposition that the federal and state standards are still the same is somewhat out of focus because the ADAAA is not retroactive, *Thornton* v. *UPS, Inc.*, 587 F.3d 27, 34 n.3 (1st Cir. 2009)("The [ADA Amendments] Act is not retroactive."), and *Faiola* considered circumstances arising before Congress enacted the ADAAA, *see* 629 F.3d 43, 45

9

(1st Cir. 2010)(plaintiff terminated in 2007).  By contrast, Murray's employment ended in 2010, after the effective date of the ADAAA.  Therefore, the amended federal standard applies.

The language in federal law defining "disability" after ADAAA remains substantially similar to the Massachusetts definition of "handicap."  Both mean "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment . . . ."  M.G.L. 151B § 1(17); *accord* 42 U.S.C. § 12102(1).  The distinction lies in the meaning of the term "substantially limits."  The federal statute provides that "[t]he term 'substantially limits' shall be interpreted consistently with the finding and purposes of the ADA Amendments Act of 2008."  42 U.S.C. § 12102(4)(B).  The Massachusetts statute does not have an analogous clause.

Defendants do not contest that Murray's back condition constitutes an "impairment."  Nor do Defendants dispute that his impairment implicates "major life activities."  Murray's back condition certainly affects his ability to walk, work, sit, stand, and lift.  However, Defendants argue that this impairment does not "substantially limit" any of these major life activities.  They also argue that there is no record that his impairment "substantially limits" any major life activities or that Defendants regarded Murray as having such an impairment.

10

In his Complaint, Murray bases his claim of handicap solely on his back condition.  In his submissions opposing summary judgment, he raises a collection of new impairments that he argues can also form the basis for his disability discrimination claims.  These new impairments include whiplash and leg pain from a car accident as well as headaches from sitting in a non-ergonomic chair.  However, "isolated medical problems (such as a broken arm that heals normally) and illnesses of short duration usually are not handicaps."  MCAD Guidelines § II(A)(6); *see also* ADA Pract. & Compliance Manual § 1:29 ("A severe limitation that is short-term and temporary is not evidence of a disability").  Murray's whiplash, leg pain, and headaches are not related to any long-term impairment.  They cannot be evidence of a disability or handicap and therefore cannot form the foundation for a disability discrimination claim.  As a result, I will restrict my analysis of Murray's disability claims to whether his back condition qualifies as a disability under either the state or federal standard, whether Warren Pumps reasonably accommodated it, and whether Murray's termination resulted from discrimination for such a disability.

 1.  Massachusetts Handicap

 Under Massachusetts law, "[a]n impairment is substantially limiting if it prohibits or significantly restricts an individual's ability to perform a major life activity as compared

to the ability of the average person in the general population .
. ."  MCAD Guidelines § II(A)(6).  It may also be substantially
limiting "when the impairment 'prevents or significantly
restricts the individual from performing a class of jobs or a
broad range of jobs in various classes.'"  *O'Brien* v. *MIT*, 976
N.E.2d 154, 158 (Mass. App. Ct. 2012) (quoting *Ocean Spray
Cranberries, Inc.* v. *MCAD*, 808 N.E.2d 257, 264 (Mass. 2004)).

In interpreting Chapter 151B, courts afford substantial
deference to Guidelines of the Massachusetts Commission Against
Discrimination ("MCAD").  *Dahill* v. *Police Dep't of Boston*, 748
N.E.2d 956, 961 (Mass. 2001).  Massachusetts courts also consider
federal case law construing the ADA and Rehabilitation Act when
determining whether a person qualifies as handicapped under
M.G.L. 151B.  *See Shedlock* v. *Dep't of Correction*, 818 N.E.2d
1022, 1031-32 (Mass. 2004).  Pre-ADAAA federal caselaw remains
particularly analogous to the M.G.L. 151B analysis because
Massachusetts has not amended M.G.L. 151B in the same way that
Congress amended the ADA.

Murray alleges that he is handicapped by virtue of his back
and spinal cord disc herniation in 1985 and his failed surgery in
1997, after which his doctors fused his L4-L5 vertebrae together.
In his affidavit, submitted in support of his opposition to
summary judgment, he states that he can only stand, sit, or walk
for up to two hours at a time and can run, but not for any

12

extended period of time.  He states that he can climb stairs as long as he goes slowly and holds onto the railing, but cannot climb objects such as ladders.  He also states that he loses between one and three hours of sleep each night due to chronic pain.  His most significant impairment, and the one most fully established on the current record, is his doctor-imposed restriction not to lift more than 10 pounds.  As a matter of law, these impairments do not rise to the level of a handicap under M.G.L. 151B.

Numerous courts have held that the inability to walk, stand, or sit continuously for more than one to two hours does not constitute a handicap.  *See, e.g., McDonough* v. *Donahoe*, 673 F.3d 41, 48 (1st Cir. 2012) (collecting cases) (inability to stand for more than one or two hours is not a disability); *Dupre* v. *Charter Behavioral Health Sys. of Lafayette, Inc.*, 242 F.3d 610, 614 (5th Cir. 2001) ("In the case before us, Dupre's ability to sit or stand in one place for up to one hour at a time . . . was not significantly restricted as compared with the average person."). For his part, Murray cites *Shedlock* for the proposition that his walking restrictions constitute a handicap, but that case actually demonstrates the deficiency of Murray's argument.  In *Shedlock*, the court held that evidence that an inmate could not walk for two or three days out of each week and could not climb stairs without the help of others created a genuine issue of

13

fact, but did not affirmatively demonstrate that the plaintiff was handicapped as a matter of law. *Shedlock*, 818 N.E.2d at 1030.  The court also noted that the differentiating factor is often whether a plaintiff needs a device such as a cane, brace or crutches to assist him in walking or standing.  *Id.* at 1030-31. In this case, Murray shows no such restrictions.  He does not require a cane, brace, or crutches in order to stand or walk, and he has sworn in his affidavit that he can climb stairs without assistance and can walk every day as long as it is not for more than an hour at time.

Murray's allegations of difficulty sleeping fare no better. As the Second Circuit held in *Colwell*, "[d]ifficulty sleeping is extremely widespread" and Murray has not demonstrated that his difficulty is substantially worse than that of the rest of the adult population.  *Colwell*, 158 F.3d at 644.  By contrast, an individual may be handicapped when the substantial interference with sleep rises to the level of only sleeping one or two hours per night and often going days at a time with "only four hours of broken sleep."  *See O'Brien* v. *MIT*, 976 N.E.2d 154, 158 (Mass. App. Ct. 2012).  Murray's impediments do not reach this level.

As for his lifting restrictions, the statute and MCAD Guidelines make clear that "lifting" constitutes a "major life activity."  *See* MCAD Guidelines § II(A)(5); *see also* M.G.L. 151B § 1(20).  However, the First Circuit has clarified that "heavy

14

lifting" does not constitute such an activity because "the capacity to perform heavy lifting is not a trait shared by the majority of the population." *Gillen* v. *Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 22 (1st Cir. 2002); *see also Benoit* v. *Tech. Mfg. Corp.*, 331 F.3d 166, 178 (1st Cir. 2003).   Otherwise, "the ranks of the disabled would swell to include infants, the elderly, the weak, and the out-of-shape." *Gillen*, 283 F.3d at 22.   Numerous courts have held that the ability to lift no more than 10 pounds continuously or 20 pounds intermittently does not constitute a disability or handicap.   *See, e.g.*, *McDonough*, 673 F.3d at 48; *Colwell*, 158 F.3d at 644.   *But see Picinich* v. *UPS, Inc.*, 321 F. Supp. 2d 485, 502 (N.D.N.Y. 2004) (permanent inability to stand, sit, or walk for more than thirty minutes at a time and to lift over 12 pounds constituted disability). Murray's back injuries limit his daily activities somewhat, but they do not rise to the level of a handicap.   As the Seventh Circuit noted, "[t]he number of Americans restricted by back problems is legion.   They are not disabled." *Mays* v. *Principi*, 301 F.3d 866, 869 (7th Cir. 2002) ("A disability within the meaning of . . . the ADA 'substantially prevents a person from engaging in one of the major activities of life.'   We doubt whether lifting more than 10 pounds is such an activity." (collecting cases)).

Finally, Murray's back condition does not substantially impair his ability to work.  In order to prove a substantial limitation on the ability to work, Murray must show "that [his] back injury precluded [him] from a class of jobs or a broad range of jobs." *Dupre*, 242 F.3d at 614; *see also Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 492 (1999).  Murray's limitations do not foreclose a class or broad range of applicable jobs.  "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.  Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Sutton,* 527 U.S. at 492.  Many jobs utilizing Murray's skills remain available to him.  He moved from his role as an electrician to a new role as a manager in order to avoid some of the activities with which he now struggles, but his impairments do not foreclose the kind of broad range of jobs contemplated by disabilities law.  In *Dupre*, the Fifth Circuit held

> [a]n inability to engage in the kind of intense physical exertion required of some jobs hardly disqualifies Dupre from all jobs involving manual labor.  Even if her claim regarding an inability to perform manual labor were true, Dupre would not necessarily be excluded from a substantial class of jobs.

*Dupre*, 242 F.3d at 615.  Likewise, Murray's impediments do not exclude him from a substantial class of jobs.  Indeed, he was able

16

to obtain appropriate employment at the same companies he had already worked for in a managerial position with responsibilities for oversight of activities related to his skill and knowledge set. *Cf. Zenor* v. *El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 861 (5th Cir. 1999) (pharmacist not substantially limited in working because there was no evidence he could not perform clerical or administrative jobs within the hospital at which he formerly worked).

   2. Federal Disability

   After the ADAAA, the federal standard for disability has become "more generous" than it was before. *Nationwide Life Ins. Co.*, 696 F.3d at 87 n.6.   Although few courts have specifically addressed what the ADAAA's expansion means for the term "substantially limits," *see Harty* v. *City of Sanford*, 2012 WL 3243282, at *5 (M.D. Fla. Aug. 8, 2012), those that have done so have applied it more broadly than previously, and federal regulations also provide some guidance.   Federal regulations provide that courts should measure "substantially limits" as "compared to most people in the general population."   29 C.F.R. § 1630.2(j)(1)(ii).   Yet the regulations repeatedly emphasize that it is "not meant to be a demanding standard," and that the focus of ADA cases "should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a

17

major life activity." 29 C.F.R. § 1630.2(j)(1)(iii). Still, "not every impairment will constitute a disability within the meaning of [29 C.F.R. § 1630.2]." 29 C.F.R. § 1630.2(j)(1)(ii); *see also Nationwide Life Ins. Co.*, 696 F.3d at 87 n.6.

I am not persuaded that Congress intended waking up in the middle of the night, only being able to walk for two hours, and an incapacity for heavy lifting to qualify as disabilities even under the more generous ADAAA standard. However, Murray's back condition does not *clearly* fall outside the range of disability under the ADAAA, and thus requires some significant analysis of what constitutes a disability. *See, e.g., Fleck* v. *WILMAC Corp.*, No. 10-05562, 2011 WL 1899198, *5 (E.D. Pa. May 19, 2011) (finding plaintiff may be disabled because she could not stand for more than an hour without an accommodation); *Picinich,* 321 F. Supp. 2d at 502 (permanent inability to stand, sit, or walk for more than 30 minutes at a time and to lift over 12 pounds constituted disability); *Harty*, 2012 WL 3243282 at *2 (plaintiff presented a genuine issue of fact regarding disability by showing that he "could not squat, kneel, use stairs, run or jump"). Therefore, because "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis," 29 C.F.R. § 1630.2(j)(1)(iii), I find that Murray has produced sufficient evidence of a collection of limitations to present the issue of disability under the federal

standard to a jury. *See Ladenheim* v. *Am. Airlines, Inc.*, 115 F.
Supp. 2d 225, 230 (D. P.R. 2000)("[T]he question of substantial
limitation is a question of fact properly decided by the
jury.")(citing *Santiago Clemente* v. *Executive Airlines, Inc.*, 213
F.3d 25, 32 (1st Cir. 2000)).

### 3.   Record of Disability or Regarded as Disabled

Murray also argues that he qualifies as a handicapped or
disabled person because he has a record of a handicap or because
he was regarded as handicapped.  Any argument that Murray
qualifies as handicapped under Massachusetts law because of a
record of impairments that substantially limit major life
activities must fail because I have already determined that
Murray's impairments do not constitute "substantial limitations"
under Massachusetts law.  Therefore, any records of his
impairments cannot qualify as "a record of having such
impairment" under the meaning of M.G.L. 151B § 1(17).

His arguments that Warren Pumps regarded him as handicapped
also fail.  Murray has produced no competent evidence in support
of this position.  The evidence existing in the record undercuts
the proposition that Warren Pumps regarded Murray as handicapped.

*First*, he argues in his brief that his supervisor, Matthew
Korzec made comments such as "a younger person would be able to
accomplish [Plaintiff's] tasks," that Plaintiff "needed to work
faster," and that Plaintiff would have been more successful if he

"had been at work more often," which Murray contends refers to
his leave from work for medical issues.  However, in his
testimony, Murray only states that Korzec made "snide comments"
that "a younger person [could] do this very easily," and confirms
vague comments about working faster and being around more.  Even
if these vague statements - untethered to any specific instance,
absence, or task - could support an inference into the way Korzec
regarded Murray - a dubious proposition in itself - the
statements certainly do not support an inference that Korzec
regarded Murray as handicapped as opposed to simply less than
vigorous or otherwise subpar.

     *Second*, Murray argues, citing his affidavit, that Peter
Elleman, Corporate Health Safety and Environmental Manager told
him that Nicole Belechto, a Corporate Recruiter for Colfax,
wanted to "get rid of" handicapped employees and that Murray was
considered handicapped.  This is heartland double hearsay not
falling under any exception.  *See* Fed. R. Evid. 805.  In other
words, "[Murray] here relies on double hearsay, an out of court
statement of [Belechto] made to [Elleman], and [Elleman's] out of
court statement made to [Murray], offered to prove the truth of
the matter asserted," that Belechto and Defendants regarded
Murray as handicapped.  *Pakizegi* v. *First Nat. Bank of Boston*,
831 F. Supp. 901, 909 (D. Mass. 1993).  Murray has offered no
reason to believe that either part of the combined statement

falls within a hearsay exception, let alone both.  Murray's recitation is not competent evidence and I decline to consider it.

*Finally*, the existing evidence probative of how Defendants regarded Murray cuts against a finding that they considered him handicapped.  Murray's supervisor, Korzec, testified that he knew of Murray's lifting restriction, but did not know of any other medical or physical restrictions.  Furthermore, while Warren Pumps was aware of Murray's back condition and lifting restriction when it hired him in both 2003 and 2008, it apparently did not find the issue important because Korzec, who recruited and hired Murray, has stated that the lifting restriction "didn't matter because his job wasn't physical in nature."

### 4.  Accommodation

Defendants argue that even if a jury finds Murray disabled under the ADAAA, he cannot sustain a claim for failure to accommodate his disability because Defendants reasonably accommodated all of Murray's requests.  I have already held that Murray does not meet the Massachusetts standard for a handicapped individual, *see supra* Section III(A)(1).  Therefore, in this section, I address only Murray's federal claim for failure to accommodate a disability.

An employer must "make reasonable accommodations to the
known physical . . . limitations of an otherwise qualified
individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  A
reasonable accommodation is a "modification[] or adjustment[] to
the work environment, or to the manner . . . under which the
position . . . is customarily performed, that enable[s] an
individual with a disability who is qualified to perform the
essential functions of that position."  29 C.F.R.
1630.2(o)(1)(ii).  An employer is not required to provide an
employee's first choice of accommodation, but must provide
reasonable accommodation to allow the employee to perform the
essential functions of his job.

Murray argues that he requested accommodations for time off,
light duty, lifting restrictions, standing/sitting restrictions,
an adjusted daily start time, not to work over-time, periodic
breaks, and for an ergonomic workstation.  In support of this
argument, Murray does not cite to any evidence that he actually
requested any of these accommodations.  He cites only to
testimony that these were his physical restrictions.
Nevertheless, even assuming Murray did request each of these
accommodations, he cannot support a failure to accommodate claim.
He admits that Defendants granted "the majority of [these]
accommodations, with the exception of breaks and ergonomics," and
argues that Defendants effectively denied his lifting restriction

accommodation because Matthew Korzec asked him to do more than 10 pounds of lifting on a number of occasions.  Murray raises no genuine dispute of material fact regarding any of the three accommodations he claims Defendants denied him.

Murray provides no evidence that his request for an ergonomic workstation relates to his back condition, stating only that his workstation "would cause the Plaintiff significant pain and headaches."  He also admitted in his deposition that the headaches and ergonomic-workstation request were not related to his back condition or sciatic nerve.  In response to the question "Were those headaches related at all to the issue that you had with your back or your sciatic nerve?," Murray answered "No." Therefore, because headaches are not an element of Murray's impediment, the ergonomic workstation cannot be a part of a reasonable accommodation for any disability and likewise cannot sustain a claim for failure to reasonably accommodate a disability.

With respect to Murray's argument that Defendants denied him the breaks he required as reasonable accommodation for his difficulties walking, standing, and sitting for long periods of time, Plaintiff cites no evidence in his submissions that he asked for breaks, let alone that Defendants denied such requests. My own review of the record reveals that the only evidence that he ever actually asked for breaks is his own testimony responding

23

to the question "you also asked for breaks in terms of
accommodations for your handicap - to sit from time to time?"
saying "Correct."  I have not uncovered any evidence in the
record capable of supporting Murray's contention that Defendants
denied his request.  Without evidence of such a denial, Murray's
claim fails.

Finally, Murray admits that Defendants acknowledged his
lifting limitations and agreed not to make him lift anything over
10 pounds.  Yet he argues that Defendants effectively denied him
a reasonable accommodation because his supervisor Korzec
"repeatedly requested and sometimes required" him to break his
lifting restriction.  In support, he points to three instances in
which Korzec "requested" or "required" Murray to lift more than
10 pounds.  First, Korzec asked Murray to paint.  Second, Korzec
asked Murray to do some wiring/manual labor, which required him
to lift a toolbox weighing more than 10 pounds.  Third, Plaintiff
accepted a large shipment weighing more than 10 pounds because
Korzec had let everyone in the shipping department go home early
on a holiday.  None of these can support Murray's claim.

Murray makes no allegation or argument that he actually did
paint or even that the painting requested would have required him
to lift more than 10 pounds.  In fact, he testified that he did
not paint.  In his deposition, he answered the question "When you
asked to not paint did [Korzec] tell you to go back and paint?"

24

by saying, simply, "No."   Murray cannot sustain a failure to accommodate claim merely by alleging that his supervisor asked everyone to paint, including Murray, when his supervisor did not force him to do so once Murray requested a reasonable accommodation.

The wiring/manual labor event presents a somewhat closer issue.  Murray testified that Korzec asked him to do some wiring work that would have required Murray to lift and carry a toolbox weighing approximately 20 pounds.  In this case, Murray testified that when he told Korzec this would force Murray to break his lifting restriction, Korzec told him to "[g]et it done somehow" and Murray ultimately lifted the toolbox.  However, he also testified that he "pulled somebody else off the floor to do it," demonstrating that another employee might have borne the lifting responsibilities and Korzec did not necessarily *require* Murray to lift the toolbox himself.  While a series of such instances might give rise to a pattern of violating Murray's lifting restriction capable of supporting a claim for failure to reasonably accommodate a disability, this one instance, in isolation, cannot sustain such a claim.

Murray's argument regarding the shipment he received does little to bolster his position.  Although Murray did testify that he spoke to Korzec, who told him that he would have to accept the shipment because all of the shipping employees had gone home

early, and that the shipment was more than 10 pounds, he also
testified that he did not ask for a reasonable accommodation.  He
testified that he did not remind Korzec that he could not lift
more than 10 pounds because "I can only tell him that so many
times.  Really.  He knows it."

These three, seemingly isolated incidents, which are far
from clear evidence that Defendants ever *required* Murray to
violate his lifting restriction - let alone that they did so
"repeatedly" - cannot sustain a claim for failure to reasonably
accommodate.

   5.   Retaliatory Termination

Defendants contend that they did not terminate Murray's
employment in retaliation for any reason related to his
disability because his employment was not terminated; rather,
they contend, he quit.  However, recognizing that this presents a
genuine issue of material fact inappropriate for resolution by
summary judgment on this record, Defendants focus on their
argument that, even assuming Murray was fired, he cannot sustain
a claim for retaliation.  Defendants challenge all three elements
of Murray's retaliation claim: (1) legally protected conduct, (2)
an adverse employment action, and (3) causal connection between
the protected conduct and the adverse employment action.  *See*
*Colon Fontanez* v. *Municipality of San Juan*, 660 F.3d 17, 36 (1st
Cir. 2011).  They also argue that the First Circuit has recently

raised the bar on the element of cause, by holding disability discrimination cannot merely be a motivating factor in the adverse employment action, rather, it must be the but-for cause. *See Palmquist* v. *Shinseki*, 689 F.3d 66, 73-74 (1st Cir. 2012) (construing the ADA as requiring but-for cause because the ADA provision was analogous to the Rehabilitation Act provision before the court); *see generally Univ. of Tex. Southwestern Med. Ctr.* v. *Nassar*, 133 S.Ct. 2517 (2013)(Title VII retaliation claims must be proved under principles of but-for causation). Because I find that Murray cannot demonstrate *any* causal link between protected conduct and adverse employment action, I do not reach the questions whether the but-for cause standard applies except to observe that Murray could not meet it.

     *a.*   *Protected Conduct*

Requests for reasonable accommodations for a disability constitute protected conduct. *Freadman* v. *Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007). Similarly, complaints of discrimination on the basis of a disability also constitute protected conduct. *Valle-Arce* v. *P.R. Ports Authority*, 651 F.3d 190, 198 (1st Cir. 2011). It is undisputed that Murray engaged in both of these forms of protected conduct. Although Defendants dispute that Murray made some of the accommodation requests he articulates in this action, they acknowledge that he made his lifting restrictions clear when

Defendants hired him in 2008 and periodically when his supervisor asked him to do tasks that would require heavy lifting. Defendants also argue that the only disability-discrimination complaint Murray lodged was in June or July of 2010, when he complained to Sylvia Cummings, a Human Resource Specialist, about how Korzec was treating him.  This argument speaks to causation. It does not undermine the fact that Murray engaged in protected conduct.  There is, therefore, no genuine dispute of fact regarding whether Murray engaged in protected conduct when he requested accommodations and complained of disability discrimination.

b.  *Adverse Employment Action*

Defendants dispute any adverse employment action, arguing that Murray quit rather than that Defendants fired him.  This presents a genuine dispute of material fact for a jury:  On the one hand, Murray swears in his affidavit that Defendants terminated his employment and offered him a severance package. On the other hand, Crystal Baker, Vice President of Human Resources, testified in her deposition that she did not terminate Murray's employment; that he was welcome to continue working at Warren Pumps after the meeting; and that after the meeting, one of the attendees told Korzec that Murray had quit.  This presents a quintessential credibility dispute inappropriate for resolution on summary judgment.  *Rodriguez* v. *Municipality of San Juan*, 659

28

F.3d 168, 175 (1st Cir. 2011) ("[T]he ground rules for summary judgment leave no room for credibility determinations, no room for the measured weighing of conflicting evidence . . . .").

Murray also argues that he suffered adverse employment actions other than termination by being harassed for his disability.  As discussed below, *see infra* Section III(C), these allegations do not rise to the level of harassment or a hostile work environment, and they also do not constitute adverse employment actions.

### c. Causal Connection

To show a causal connection, Murray relies on the permissible inference of causation when allegedly retaliatory acts occur close in time to the protected activity.  *See Ruffino* v. *State Street Bank & Trust Co.*, 908 F. Supp. 1019, 1046 (D. Mass. 1995) ("[T]emporal proximity may provide the necessary [causal] nexus.").  But this reliance is misplaced.  None of Murray's protected conduct happened within a sufficiently short time before his termination to support a reasonable inference of causation.

The meeting during which Murray either quit or was fired occurred on June 1, 2011.  All of the instances of protected conduct to which Murray ascribes a specific date happened long before that meeting.  For instance, Murray testified that he complained to Sylvia Cummings in "mid-2010, somewhere into the

29

June or July area."  This is a year before the date Murray
alleges Defendants fired him.  Similarly, the only date Murray
ascribes to an accommodation request with any level of precision
relates to the discussion surrounding his re-hire in 2008, three
years before the date Murray alleges Defendants fired him.
Although he states that he told Korzec he could not paint
"sometime in 2010," that incident occurred no later than six
months before the June 1, 2011 meeting, even assuming, for the
sake of argument, it constituted a request for reasonable
accommodation at all.  Finally, Murray testified that the
incident during which he told Korzec that he could not do
electrical work occurred "sometime after the car accident" in
December 2010, leaving a potential six-month span of time in
which the incident might have occurred.  None of these events has
the "temporal proximity" necessary to raise an inference of
causation.

       With respect to the painting and electrical work incidents,
Murray does not sufficiently specify when those events occurred.
Therefore, "any temporal link is entirely conjectural."  *Ahern* v.
*Shinseki* 629 F.3d 49, 58 (1st Cir. 2010).  Because "[c]onclusions
that rest wholly on speculation are insufficient to defeat a
motion for summary judgment," such a conjectural temporal link
cannot support a claim for retaliation.  *Id.*

With respect to Murray's re-hire and complaint of disability discrimination, both occurred more than a year before the June 1, 2011 meeting, far outside the temporal range giving rise to an inference of causation.  *See id.* ("[A] gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action."); *Calero-Cerezo* v. *U.S. Dep't of Justice,* 355 F.3d 6, 25 (1st Cir. 2004)(periods of three or four months are insufficient to establish a causal connection (collecting cases)).

*          *          *

Murray does not meet the definition of handicap under Massachusetts law, and he has not raised any material factual dispute regarding a failure to accommodate a disability or retaliation for protected activity related to his disability under federal law.  I will therefore grant summary judgment to the defendants regarding his disability and handicap discrimination claims under both state and federal law.

**B.   *Safety Concerns***

Murray argues that Defendants impermissibly terminated his employment in retaliation for his safety complaints.  An employer may not terminate an employee "when employment is terminated contrary to a well-defined public policy."  *Wright* v. *Shriners Hosp. for Crippled Children*, 589 N.E.2d 1241, 1244 (Mass. 1992). This is an exception to the general rule that an employer may

terminate at-will employees for "almost any reason or no reason at all." *Id.* at 1244.  "The public policy exception is interpreted narrowly to prevent conversion of the general rule . . . into a rule that requires just cause to terminate an at-will employee." *Mercado* v. *Manny's T.V. & Appliance, Inc.*, 928 N.E.2d 979, 983 (Mass. App. Ct. 2010) (internal alterations and quotation marks omitted).  Defendants maintain that Murray quit and that they did not terminate his employment, but as discussed above, *see supra* Section III(A)(5)(b), this presents a dispute of fact inappropriate for summary judgment.  In the alternative, Defendants argue that Murray's safety concerns claim fails for two reasons: (1) a plaintiff cannot sustain a retaliation claim based on safety complaints unless the complaints implicate criminal wrongdoing, which is not present in this case, and (2) Murray cannot sustain his particular retaliation claim based on raising safety complaints because raising such complaints was in the nature of his job as Safety and Compliance Manger.

### 1.  Criminal Wrongdoing

Murray's safety complaints fall into four categories: (1) welding safety violations, (2) electrical work violations, (3) lack of proper Personal Protection Equipment ("PPE") and training, and (4) employees' operation of forklifts and other vehicles without a commercial drivers license.

Murray alleges that Warren Pumps employees were welding without the proper monitoring devices surrounding the welding area, without the proper protective equipment, and that at least one employee was welding upside down or vertically when he was only certified to weld flat.  He alleges that these practices violate a number of industry standards, such as AWS-d18.1 and ASTM 312, as well as federal regulations such as 29 C.F.R. 1910.253(a)(4).  These standards and regulations govern safety procedures, but Murray has not provided any support for the proposition that they implicate criminal liability.[1]

---

[1] Murray argues that violations of OSHA or the electrical code implicate criminal penalties, but this misconstrues statutory and case law.  He cites *United States* v. *Ward*, No. CRIM 00-681, 2001 WL 1160168 (E.D. Pa. Sept. 5, 2001) for the proposition that OSHA violations can result in criminal liability.  However, *Ward* deals specifically with 29 U.S.C. § 666(e) which is not at issue here and which imposes criminal liability for willful violations of safety regulations resulting in an employee's death.  *Id.* at *1. Murray does not allege that any employee has died or that any safety violations were willful.   Therefore, *Ward* is inapposite. He also cites *Commonwealth* v. *Porrazzo*, 516 N.E.2d 1182 (Mass. App. Ct. 1988) for the proposition that violations of electrical codes can implicate criminal liability.  However, *Porrazzo* dealt with specific statutory provisions.  *Id.* at 1184.  *Porrazzo* discussed M.G.L. 143 § 3L, which provides criminal penalties for failure to give notice before conducting certain work, but Murray makes no allegations that Defendants failed to provide such required notice in this case. Finally, he cites *Mercado* v. *Manny's T.V. & Appliance, Inc.*, 928 N.E.2d 979, 983 (Mass. App. Ct. 2010), in which the plaintiff was fired for refusing an order to continue installing appliances illegally, *see id.* at 141, facts not present in this case.  Murray does not allege that Defendants ordered him to engage in any conduct they knew to be illegal.

Murray also alleges that Warren Pumps impermissibly allowed other employees to do electrical work under Murray's license outside his presence, and without the proper protective equipment.  He alleges that these practices violate a number of industry standards, such as 527 C.M.R. 12, as well as state statutes, such as M.G.L. 14 § 5, 8.  These standards and statutes govern safety procedures, but Murray has not provided any support for the proposition that they implicate criminal liability.

Murray next alleges that his supervisors denied his requests to purchase required PPE, refused to allow him to attend OSHA training, failed to implement a training and noise level program when the shop floor exceeded 85 decibels, and failed to institute Hazard Communication Standard (HAZCOM) training.  He alleges that these practices violate a number of federal regulations such as 29 C.F.R. 1910.95, 1910.133, 1910.134, 1900.1200.  These regulations govern safety procedures, but Murray has not provided any support for the proposition that they implicate criminal liability.

Finally, Murray alleges that Warren Pumps failed to certify employees properly to operate forklifts, trucks, and cranes, but he cites no statutes or other law in support.

When an employee brings a claim for wrongful termination on the basis of retaliation for internal complaints regarding company conduct,

34

> The distinction of importance is between a discharge
> for an employee's internal complaint about company
> policies or the violation of company rules, for which
> liability may not be imposed, and an internal complaint
> made about the alleged violation of the criminal law
> for which we now decide that liability may be imposed.

*Shea* v. *Emmanuel College*, 682 N.E.2d 1348, 1350 (Mass. 1997).

Murray's complaints fall into the gap between the two poles

identified by the *Shea* court.  They are not based on internal

company policies, which clearly cannot be the basis for a claim

wrongful termination in violation of public policy.  *See, e.g.,*

*Falcon* v. *Leger*, 816 N.E.2d 1010, 1017-18 (Mass. App. Ct. 2004)

("It is well established that Massachusetts law does not protect

at-will employees who claim to be fired for their complaints

about internal company policies or the violation of company

rules, even though the employees' actions may be considered

appropriate and 'socially desirable.'"); *Smith-Pfeffer* v.

*Superintendent of the Walter E. Fernald State Sch.*, 533 N.E.2d

1368, 1371-72 (Mass. 1989).  Neither are his complaints based on

alleged violations of criminal law, which clearly would support

such a claim.  *See, e.g., Shea*, 682 N.E.2d at 1350.  Rather, he

complains about non-criminal statutory mandates governing the

health and safety of a variety of industries.  *But cf. Wright* v.

*Shriners Hosp. for Crippled Children*, 589 N.E.2d 1241, 1245

(Mass. 1992) ("[W]e have never held that a regulation governing a

particular profession is a source of well-defined public policy

sufficient to modify the general at-will employment rule, and we

decline to do so now."). This murky interstitial area lacks clear guidance in the case law.

In 1988, the Massachusetts Supreme Judicial Court held that a nurse who attempted to enforce the municipal ordinance that nursing staff must supervise hospital patients who wanted to cook meals sufficiently plead a claim for wrongful termination in violation of public policy. *Hobson* v. *McLean Hosp. Corp.*, 522 N.E.2d 975, 977-98 (Mass. 1988). Since then, Massachusetts courts at every level have acknowledged that "[i]f [an] employer discharges an at-will employee . . . for fulfilling her duty to assure the employer's compliance with the law involving public safety . . . , another class of public policy considerations warrants recovery." *Mello* v. *Stop & Shop Co., Inc.*, 524 N.E.2d 105, 106-07 (Mass. 1988). More recently, the Massachusetts Appeals Court stated the principle more broadly, holding that "[o]ur cases have suggested that an employee could be shielded from the risk of discharge if he or she reasonably, but perhaps erroneously, reports that an employer is violating State and municipal laws and ordinances concerning public safety." *Falcon* v. *Leger*, 816 N.E.2d 1010, 1019 (Mass. App. Ct. 2004). ("Where Falcon's claims are grounded in regulations directly bearing on public safety, we will give weight to the statement of public policy that such regulations represent."). However *Falcon* dealt with a different set of circumstances from those at issue here.

The court in *Falcon* denied a defendant's motion for summary judgment where the plaintiff refused his employer's orders purposefully to deceive a safety inspector, conduct that the court characterized as tantamount to fraud.  *See id.* at 1017, 1019.  In this case, Murray has made no allegations that Warren Pumps asked him to deceive anyone or engage in conduct tantamount to fraud.

On the other hand, numerous Massachusetts courts have held that the existence of a safety statute is not, alone, sufficient to constitute an established public policy precluding termination.  The Supreme Judicial Court held that

> [w]hile we often look to statutes to find
> pronouncements of public policy, it is not
> necessarily true that the existence of a statute
> relating to a particular matter is by itself a
> pronouncement of public policy that will protect,
> in every instance, an employee from termination.

 *King* v. *Driscoll*, 638 N.E.2d 488, 493 (Mass. 1994); *see also Smith-Pfeffer*, 533 N.E.2d at 1371 ("An employee, even one in a socially important occupation, who simply disagrees with her employers policy decisions, may not seek redress in the courts.").  In this connection, a justice of the Massachusetts Superior Court held that a plaintiff's complaints that the company did not have adequate staff to meet FDA regulations was insufficient it invoke the public policy exception to at-will termination.  *See Nelson* v. *Anika Therapeutics*, No. 09-03231, 2011 WL 4056320, *6 (Mass. Super. Aug. 12, 2011) (Leibensperger,

J.).   The court there held that the plaintiff raised only issues
of background safety compliance leading to *potential* safety
concerns, but not any actual concerns.   *Id.* at *8 ("[The
violations] *might possibly* allow product to be sold that could be
unsafe.   There is no allegation or evidence that a product sold
by Anika was, in fact, harmful or unsafe.") (emphasis in
original); *see also King* v. *Driscoll*, 638 N.E.2d at 493 (a policy
governing something that has the potential to due harm does not
necessarily lay the groundwork for a claim of wrongful
termination in violation of public policy.   The effect is has to
remote an effect until there is some specific danger to public
safety.).

It is clear that the simple existence of a safety statute is
not sufficient to create the kind of established public policy
that shields an employee from termination.   However, Defendants'
proposed bright line rule requiring a showing of criminal
liability finds no support in a study of the relevant case law.

In order for complaints under a statute to shield an
employee from termination, the plaintiff must either raise
instances of some specific danger to public safety, not merely an
unsafe process that *may* lead to unsafe products, or else he must
demonstrate that the statutes provide for criminal liability.   In
the final analysis, Murray has shown neither.   His complaints
concern issues of safety in the process of creating pumps, not a

38

specific concern over unsafe pumps themselves. *See Nelson*, 2011 WL 4056320 at *6. He has also failed to show that any of his complaints implicate violations carrying criminal liability. Therefore, I find that Murray cannot invoke the public policy exception to the general at-will termination rule.

    2.   <u>Safety and Compliance Manager</u>

    Defendants propose another bright line rule, arguing that Murray cannot complain that Defendants fired him for raising safety concerns because his job was to raise safety concerns. This proposed categorical test cannot withstand even cursory scrutiny of the case law. The Supreme Judicial Court has repeatedly held firing an employee for enforcing safety regulations for which he is responsible violates an important public policy and is actionable. *See, e.g., Flesner* v. *Tech. Comm'ns Corp.*, 575 N.E.2d 1107, 1110 (Mass. 1991); *Mello* v. *Stop & Shop Co., Inc.*, 524 N.E.2d 105, 106-07 (Mass. 1988).

    However, Defendants do raise a reasonable concern that allowing all at-will safety inspectors to bring claims for wrongful termination in violation of public policy simply for doing their job - raising safety concerns - would effectively insulate all safety and compliance employees from the at-will employee doctrine, effectively swallowing the rule. See *Nelson*, 2011 WL 4056320 at *6 ("Nelson's alleged reporting of a potential threat to public safety is too remote. This is especially true

39

in the context of a quality control manager . . . . Nelson's theory would insulate every quality control or compliance manager from the at-will doctrine where the employee was simply doing his or her job (reporting deficiencies). The public policy exception to the at-will employment rule is not that broad." (internal citations and quotations omitted)). Nevertheless, it would be similarly untenable to hold that companies are categorically incapable of responding adversely regarding a safety and compliance employee for the way he makes safety complaints, no matter how egregious the employer's actions.

The problem lies in proof of causation. If courts were to allow a safety and compliance employee to rely solely on temporal proximity between an adverse employment action and a safety complaint, the causation element would be meaningless because, by the very nature of his job, there will presumably always be a safety complaint in close proximity to the adverse action. This would obliterate the at-will doctrine. I therefore find that when a safety compliance offer invokes the public policy exception to the at-will doctrine for alleged retaliation for raising safety complaints, the plaintiff must do more to show causation than merely demonstrate temporal proximity. Although temporal proximity exists in this case because Murray raised a flood of complaints in April and May 2011, and his employment ended on June 1, 2011, see Ruffino, 908 F. Supp. at 1046

40

("[T]emporal proximity may provide the necessary [causal]
nexus."), a safety compliance officer seeking to hold his
employer liable for alleged retaliation against him for doing his
job must show more.  This, Murray has not done.  He has only
provided evidence that his supervisors told him he no longer
seemed happy with his job, which Murray confirmed.  This is not
evidence that Defendants fired him for raising complaints.

I will grant summary judgment on Murray's claims for
retaliation based on his safety complaints on this independent
basis as well.

## C.    *Harassment and Hostile Environment*

I have already held that Murray does not qualify as
handicapped under Massachusetts state law.  Therefore, he can
only sustain his harassment and hostile environment claims under
the ADA, if at all.  As a preliminary matter, it is not entirely
clear that the ADA supports such claims in this Circuit, though
it is likely that the First Circuit would hold that it does.
While other circuits have held that the ADA can support such
claims, *see, e.g., Flowers* v. *S. Reg'l Physician Serv., Inc.*, 247
F.3d 229, 235 (5th Cir. 2001); *Fox* v. *Gen. Motors Corp.*, 247 F.3d
169, 176 (4th Cir. 2001), the First Circuit has declined the
opportunity to rule explicitly on the issue, *see Rocafort* v. *IBM*,
334 F.3d 115, 121 (1st Cir. 2003), but has on at least one
occasion "assumed such claims to be cognizable," *see id.* (citing

41

*Rivera-Rodriguez* v. *Frito Lay Snacks Caribbean, A Div. of Pepsico P.R., Inc.*, 265 F.3d 15, 23 (1st Cir.2001)).  I find that the ADA can support a claim for hostile work environment.  *See Rodriguez* v. *Loctite P.R., Inc.*, 967 F. Supp. 653, 662-63 (D.P.R. 1997). However, Murray presents no genuine dispute and no facts from which a reasonable jury could find a hostile work environment where "the complained of conduct was so severe or pervasive that it altered the terms of [his] employment."  *Pomales* v. *Celulares Telefonica, Inc.*, 447 F.3d 79, 80 (1st Cir. 2006).

Murray bases his hostile work environment claim on three facts: (1) the allegedly discriminatory comments Matthew Korzec made to him, (2) Korzec and Nicole Belechto questioning why he needed to take time off whenever he requested it, and (3) Korzec's requests that Murray perform tasks outside his lifting restrictions.  These fall far short of the requirements of a hostile environment claim.

As discussed above, *see supra* Section III(A)(3), it is a dubious proposition whether Korzec's statements such as "a younger person would be able to accomplish [Plaintiff's] tasks," and that Plaintiff "needed to work faster," implicate Murray's alleged disability at all.  Even if Murray could somehow prove that such comments were directed specifically at his impairments, they are "mere offensive utterance[s,] and . . . [do not]

unreasonably interfere[] with an employee's work performance."
*Pomales*, 447 F.3d at 83.

Next, it is in the nature of Korzec's position as supervisor and Belechto's position in human resources to inquire into the reasons for employee's requested leave.  If a plaintiff could survive summary judgment on a hostile environment claim merely by providing evidence that his supervisor and human resources personnel asked him the reasons for requested leave when he asked for it, every disabled person could bring a hostile work environment claim no matter how appropriate or understanding the employer's response might be.  Murray provides no evidence that these questions from Korzec and Belechto fell outside the appropriate and necessary duties of their jobs.  He therefore cannot sustain a claim for a hostile environment.

Finally, and as discussed more fully above, *see supra* Section III(A)(4), Korzec's few requests that would have required Murray to break his lifting restrictions were not "so severe or pervasive that [they] altered the terms of [his] employment." *Pomales*, 447 F.3d at 80.  As discussed above, Korzec requested that all employees help with painting; it was not directed at Murray or his alleged disability.  Murray received the shipment because the shipping staff had already left; this cannot be construed as directed toward his alleged disability.

43

Furthermore, three incidents over the course of approximately three years of employment constitute isolated incidents which "will not amount to discriminatory changes in the terms and conditions of employment" unless "extremely serious." *Chamberlin* v. *101 Realty, Inc.*, 915 F.2d 777, 783 (1st Cir. 1990). Korzec's requests are not the kind of "extremely serious" forms of harassment necessary to overcome the presumption against finding that isolated incidents give rise to a hostile environment.

I therefore will grant defendants summary judgment as to Murray's harassment and hostile environment claims.

## IV. CONCLUSION

For the foregoing reasons, I GRANT Defendants' motion for summary judgment (Dkt. 19). I direct the Clerk to enter judgment for the Defendant.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE